James E. Cecchi
Mark M. Makahil
CARELLA, BYRNE, CECCHI
OLSTEIN, BRODY & AGNELLO
5 Becker Farm Road
Roseland, New Jersey 07068
(973) 994-1700
Attorneys for Plaintiff

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| AMBER MOUNTAIN TRADING LP, Individual and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>DANIEL E. STRAUS, RICHARD SHINTO, STEPHEN BAKER, JONATHAN KOLATCH, and RAPHAEL BENAROYA,<br><br>Defendants, | Case No.<br><br>CLASS ACTION<br><br>DEMAND FOR JURY TRIAL |

## VERIFIED STOCKHOLDER CLASS ACTION COMPLAINT

Plaintiff Amber Mountain Trading LP ("Plaintiff") (principal place of business at 100 E Huron Street, Apt. 4002, Chicago, IL 60611), directly on behalf of itself and all other similarly situated former stockholders of InnovaCare, Inc. ("InnovaCare" or the "Company") brings this Verified Stockholder Class Action Complaint (the "Complaint") against Daniel E. Straus (located at 42 Lincoln St., Englewood NJ 07631), Richard Shinto (located at 18992 Montecito Dr., Yorba Linda, CA 92886), Stephen Baker (located at 3508 Belmar Blvd., Neptune, NJ 07753), Jonathan Koltach (144 Walnut Street, Englewood, NJ 07631), and Raphael Benaroya (located at 2000 Island Blvd., Apt. 2709, Aventura, FL 33160) for breaches of fiduciary duty. The allegations in this

Complaint are made upon Plaintiff's knowledge as to itself and, as to all other matters, upon information and belief, including the investigation of undersigned counsel of publicly available information and documents produced to Plaintiff by the Company in response to its books and records demand.

**INTRODUCTION**

1. This case primarily arises because Daniel Straus ("Straus"), the founder, chairman, and controlling stockholder of InnovaCare, siphoned off at least ***$90 million*** in buyout consideration for himself and out of the pockets of InnovCare's minority stockholders. In connection with the sale of InnovaCare to affiliates of Summit Partners, L.P. ("Summit") (the "Merger"), Straus caused the InnovaCare board of directors (the "Board"), which he controls, to approve terms that paid Straus substantial side benefits that directly reduced the Merger consideration paid to minority stockholders.

2. On July 16, 2019, InnovaCare entered into a merger agreement (the "Merger Agreement") with affiliates of Summit whereby Summit agreed to acquire InnovaCare for initial total cash consideration of $1.05 billion.

3. The total consideration paid by Summit was not shared equally among all InnovaCare stockholders. Rather, a material amount (nearly 10%) came off the top as side payments to Straus, including an unjustifiably large $64 million payment disguised as consideration for a personal covenant not to compete. That agreement is riddled with loopholes making it implausible the counterparty would ever conclude the terms provide sufficient protection against competition by Straus. [redacted]

[redacted]

4. The Board's willingness to accede to Straus's demands is no surprise. All directors served at Straus's unfettered discretion [redacted] Further, Company insiders, including Straus, approved the Merger as stockholders by written consent. Despite Straus's massive side benefits, minority stockholders were not provided an opportunity to separately vote on whether to approve the Merger and the various side payments.

5. As discussed in detail *infra*, the Merger was not entirely fair to InnovaCare's minority stockholders. Straus, with Board support, put the interests of himself and other insiders before the interests of all InnovaCare stockholders. In orchestrating the Merger, Straus breached his fiduciary duties and caused his dominated Board to do the same. As a result, the side payments tainted the entire Merger, calling into question Straus's and other insiders' reasons for voting in support of the Merger.

6. This action seeks to recover damages on behalf of the Company's minority stockholders. Because Straus was InnovaCare's controlling stockholder and minority stockholders were afforded no procedural protections, Defendants will have the burden of proving the Merger was entirely fair to all stockholders. This, they cannot do.

## JURISDICTION AND VENUE

7. This Court have diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332. Plaintiff is a Cayman Island limited partnership with its headquarters in Illinois. Its members (including its general partner) are domiciled in Illinois, New York, or the Cayman Islands. None

of the Defendants are domiciled in Illinois, New York, or the Cayman Islands and the amount in controversy exceeds $75,000, exclusive of interests and costs.

8. Several Defendants are domiciled in New Jersey and InnovaCare's corporate headquarters are located in Fort Lee, New Jersey. Thus, this Court has jurisdiction over each Defendant because each Defendant is domiciled in New Jersey and/or served as a director and/or officer of InnovaCare. Further, each Defendant traveled to this District on InnovaCare business and/or has authorized acts that have had a sufficient impact on InnovaCare and InnovaCare stockholders (including approval of the Merger) in this District. For these reasons, each Defendant has sufficient minimum contacts with New Jersey so as to render the exercise of jurisdiction by the New Jersey courts permissible under traditional notions of fair play and substantial justice.

9. This action is not a collusive one to confer jurisdiction on a Court of the United States which it would not otherwise have.

10. Venue is proper in this District pursuant to 28 U.S.C. §1391 because InnovaCare is headquartered and conducts substantial business in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

## PARTIES AND RELEVANT NON-PARTIES

### I. Plaintiff

11. Plaintiff Amber Mountain Trading LP ("Plaintiff") is a Cayman Island limited partnership headquartered in Illinois. Its members (including its general partner) are domiciled in Illinois, New York, or the Cayman Islands. Plaintiff was a stockholder of InnovaCare at all relevant times.

### II. Defendants

12. Defendant Daniel E. Straus ("Straus") founded InnovaCare and served as the Executive Chairman since at least December 2005 through the consummation of the Merger.

Straus was the Company's controlling stockholder at all relevant times. [redacted] Straus is the Founder and Principal of The Straus Group, a private investment office. According to his biography on the website of The Straus Group, Straus was admittedly the controlling stockholder of InnovaCare prior to the Merger. [redacted] Straus was also the founder, principal stockholder, president, and CEO of The Multicare Companies, Inc. ("Multicare") until it was sold in 1997 and he operated Aveta Health ("Aveta") until he sold it to United Healthcare in 2012. Upon information and belief, Straus is domiciled in New Jersey.

13. Defendant Richard Shinto ("Shinto") served as a director of InnovaCare at the time of the approval and consummation of the Merger. [redacted] He also has served as CEO of InnovaCare and its predecessors since at least 2008. Additionally, Shinto has served as CEO of MMM (Medicare y Mucho Mas) Health Plan since 2008, which in 2004, the Straus Group acquired a controlling interest in and is now a subsidiary of InnovaCare. Shinto was also CEO of Aveta from 2008 to 2012. Prior to being named CEO of Aveta, he served as CEO of NAMM California ("NAMM"), which was acquired in 2005 by Aveta. Given his current and prior executive positions at companies affiliated with Straus, Shinto lacks independence from Straus. Upon information and belief, Shinto is domiciled in New Jersey.

14. Defendant Stephen Baker ("Baker") served as a director and a member of the Transaction Committee of InnovaCare at the time of the approval and consummation of the Merger. [redacted] He is currently the President and CEO of Quality Care Management LLC, which operates and manages nursing and sub-acute rehabilitation facilities in central New Jersey. From 1992 to 1996, Baker held various leadership

positions, including Executive Vice President, COO, and CFO, at Multicare, which Straus and his brother Moshael Straus founded and controlled. Given his longstanding ties and twenty-seven year business relationship with Straus, Baker lacks independence from Straus. Upon information and belief, Baker is domiciled in New Jersey.

15. Defendant Jonathan Kolatch ("Kolatch") was a director of InnovaCare at the time of the approval and consummation of the Merger. [redacted] He founded Redwood Capital Management LLC in August 2000. Kolatch and Straus are long-term friends and colleagues. Kolatch has served as a director of both InnovaCare and Aveta. Further, both Kolatch and Straus graduated from Columbia University together in 1978. Since that time, Kolatch and Straus have both lived within walking distance of one another in the town of Englewood, New Jersey. While residents of Englewood, Kolatch and Straus co-hosted a political campaign event for Senator Robert Menendez. Further, Kolatch and Straus both acted as primary funders of the Moriah Tuition Affordability Program for the Moriah School, located in Englewood, New Jersey. Additionally, Straus and Kolatch both have given donations to the East Hill Synagogue in Englewood, New Jersey, and presumably both are members of the congregation. Given his long-standing personal ties to Straus, Kolatch lacks independence from Straus. Upon information and belief, Koltach is domiciled in New Jersey.

16. Defendant Raphael Benaroya ("Benaroya") served as a director and a member of the Transaction Committee of InnovaCare at the time of the approval and consummation of the Merger. [redacted] Benaroya is admittedly a close family friend of Straus. In the aftermath of Hurricane Sandy, Straus issued a press release about

plans to assist employees of CareOne[1] deal with the fallout from the hurricane. That release states, in pertinent part, "Elizabeth Straus [daughter of Straus] spearheaded an effort along with ***close family friends***, Raphael Benaroya and Justice Gary S. Stein to raise more than $1 million to give back to the staff at the company. They held a casino night fundraiser, and Daniel Straus and those friends whom he asked all contributed to the fund as well."[2] Thereafter, Straus established the CareOne Disaster Relief Fund and selected Benaroya to sit on the Selection Committee. Given his close personal relationship to Straus, Benaroya lacks independence from Straus. Upon information and belief, Benaroya is domiciled in Florida.

## III. Relevant Non-Parties

17. Relevant Non-Party InnovaCare, Inc. ("InnovaCare" or the "Company") was, at the time of the Merger, a Puerto Rico incorporated company headquartered at 173 Bridge Plaza North, Fort Lee, NJ 07024.

18. Relevant Non-Party Joseph Mark ("Mark") served as a director of InnovaCare at the time of the approval and consummation of the Merger. [redacted] Mark is also a long-time business partner of Straus. He is the President of HRP Capital Inc. ("HRP"), which, founded in 2004, was run by Straus. Mark co-founded Aveta with Straus and from January 2003 until January 2007, served as CEO and President of Aveta and its predecessor company. Additionally, based on press releases and other publicly available information, Mark served as Principal of the Straus Group from at least 2001 to, upon information and belief, at least 2016. Given his current and prior executive positions at companies affiliated with Straus, Mack lacks independence from Straus.

---

[1] CareOne, a developer, operator and manager of inpatient healthcare properties, was founded by Straus in the late 1990s.

[2] Unless otherwise noted, emphasis is added.

19. Relevant Non-Party David Nathan Roberts ("Roberts") served as a director of InnovaCare at the time of the approval and consummation of the Merger. [redacted] Roberts had served as a director of InnovaCare and its predecessor Aveta since at least 2006. Roberts is also a Senior Managing Director of Angelo, Gordon, with responsibility for managing the firm's private equity and special situations area. Publicly available information shows Angelo, Gordon has extensive business relationships with Straus's companies, including Multicare and the Straus Group. Given his long-standing professional connections to Mr. Straus, Mr. Roberts lacks independence from Mr. Straus.

20. Relevant Non-Party Douglas Malton ("Malton") served as InnovaCare's CFO at all relevant times. Prior to that, he served in a number of senior management roles, including CFO, from the founding of Aveta in 2004 through its sale in 2012. Prior to serving at Aveta, Malton was a member of the Straus Group, where he focused on investing in the healthcare services sector.

21. Relevant Non-Party Stuart Altman ("Altaman") served as a director of InnovaCare at the time of the approval of the Merger. [redacted]

22. Relevant Non-Party Summit Partners, LP ("Summit") is a global private equity investment firm headquartered in Boston, Massachusetts. Summit, through its affiliates, acquired InnovaCare in the Merger.

**DEFENDANTS' FIDUCIARY DUTIES**

23. At the time of the Merger, InnovaCare was a Puerto Rico incorporated corporation. Under Puerto Rico law, "[w]henever the directors, officers and majority stockholders have personal interests in matters affecting the corporation, they shall be subject to a duty of loyalty which bounds them to act fairly in relation to corporate issues." 14 L.P.R.A. § 3564. The Puerto Rico corporate statutes are modeled on the Delaware General Corporation Law, and thus Puerto

Rico courts hold that Delaware law is highly persuasive. *See, e.g.*, *Multinational Ins. V. Benitez*, 2015 TSPR 63 (P.R. 2015); *Wiley v. Stipes*, 595 F. Supp. 2d 179, 185 (D.P.R. 2009).

24. Under Delaware law, a controlling stockholder cannot abuse its position of control to compete with minority stockholders for consideration and extract greater consideration or a unique benefit in the context of a merger transaction. *See In re Straight Path Commc's Inc. Consol. S'holder Litig.*, 2018 WL 3120804, at *15 (Del. Ch. June 25, 2018), *aff'd sub. nom. IDT Corp. v. JDS1, LLC*, 206 a.3D 260 (Del. 2019). If a controller does so, the transaction is subject to "entire fairness scrutiny to assuage the risk that a controller who stands to earn 'different consideration or some unique benefit' will flex his control to secure that self-interested deal to the detriment of minority stockholders." *Id.* Additionally, directors cannot harbor self-interest adverse to the stockholders' interests or act to advance the self-interest of an interested party from whom they could not be presumed to act independently in the context of a merger transaction. *In re Cornerstone Therapeutics Inc., S'holder Litig.*, 115 A.3d 1173, 1179-80 (Del. 2015).

25. A controlling stockholder can avoid entire fairness scrutiny if and only if the transaction is conditioned *ab initio* on (i) the approval of an independent, adequately-empowered special committee that fulfills its duty of care, ***and*** (ii) the vote of a majority of the minority stockholders. *Tornetta v. Musk*, Ca. No. 2018-0408-JRS, 2019 WL 4566943, at *14 (Del. Ch. Sept. 20, 2019).

## <u>SUBSTANTIVE ALLEGATIONS</u>

### IV. Background of InnovaCare

26. InnovaCare provides managed care services for Medicare Advantage beneficiaries in Puerto Rico and Florida, as well as managed care health insurance benefits for Medicaid eligible persons in Puerto Rico. The Company also services patients via its network of physician practices in the Central Florida area.

27. InnovaCare traces its roots back to 1998 when Defendant Shinto joined NAMM and worked with NAMM to help healthcare organizations provide quality care more efficiently. In 2003, NAMM formed a partnership with The Straus Group and Defendant Straus became Executive Chairman of the Company's Board. [redacted]

28. The Company grew immensely in the subsequent eight years, including by acquiring MMM Healthcare in Puerto Rico, which is its main operating subsidiary to this day. During that time, the Company operated as Aveta. In December 2012, the Company's management team sold certain properties of NAMM, including Aveta, and officially formed InnovaCare.

**V. The Merger and the Side Deals**

29. On July 16, 2019, InnovaCare entered into a merger agreement with affiliates of Summit whereby Summit agreed to acquire InnovaCare for initial total cash consideration of $1.05 billion. The Merger closed on December 26, 2019.

30. The actual amount of the cash consideration was subject to numerous adjustments, including adjustments based on working capital requirements, debt balances, escrow amounts, and transaction expenses. After all adjustments, stockholders received $8.91 per share in cash.[3]

31. The adjustments to the $1.05 billion initial cash consideration included decreases for what are defined as the "Affiliated Closing Payments" and the "Rollover Amount," which are

---

[3] Following the closing, stockholders could also receive up to $1.16 in cash per share from amounts that were placed in escrow to cover potential liabilities and adjustments and up to $0.03 in cash per share from a reserve fund held by the "Equityholders' Representative," which was a an entity wholly owned by Straus.

the result of related party side deals designed to benefit insiders Straus, Shinto, and Malton at the expense of the InnovaCare's stockholders. As such, in connection with the Merger, these Defendants will receive additional and separate consideration and benefits than other common stockholders. Not only are these payments and benefits not equally shared with other InnovaCare stockholders, but they also directly reduced the amount of consideration InnovaCare's stockholders would have received from the Merger.

32. The Affiliated Closing Payments comprised a variety of payments Straus or his affiliated entities will receive, including:

a. $67,500,000 pursuant to a newly entered into Restrictive Covenant Agreement dated as of July 16, 2019 with $64 million allocated to purported non-compete restrictions;

b. $13,586,846 in connection with the termination of his employment agreement as reflected by an amended employment agreement entered into on July 15, 2019 to reflect the mutual understanding of Straus and the Company with respect to certain payments to be made upon termination of the employment agreement;

c. $4,725,000 in connection with the termination of a Management Services Agreement;

d. $150,000 in connection with the termination of an Intercompany Legal Services Agreement; and

e. $12,300,000 to settle a threatened litigation over tax liabilities.[4]

[4] Straus, or his affiliated entities, will also receive $175,000 per year as the "Equityholders' Representative" in connection with the Merger Agreement and will still receive payments through at least December 31, 2024 as the landlord to InnovaCare's corporate headquarters.

33. All told, the merger consideration provided to stockholders was reduced by at least $98,261,846 so that Straus can receive his side benefits and profit,

34. Moreover, Shinto and Malton rolled over 25% of their respective pre-tax portions of the merger consideration into equity interests in the post-closing Company. As a result, unlike the rest of InnovaCare's stockholders, they will continue to receive value from the future upside of InnovaCare's operations. Additionally, they kept their valuable jobs and continue to run InnovaCare post-closing and entered into amended employment agreements. Shinto's new employment agreement provides him with a $1,041,862 annual base salary and an annual target bonus of $1.2 million. Malton's new employment agreement provides him with a $675,000 base salary and an annual target bonus of $675,000.

35. All of these Side Deals took money directly from the pockets of the Company's outside stockholders, which placed the interests of the Company's insiders in direct conflict with its outside investors. Despite these obvious conflicts of interest, the Company failed to implement any protection whatsoever for minority stockholders, such as a special committee of independent directors or a majority of minority vote.

36. Instead, the board of directors (the "Board") formed a Transaction Committee of Defendants Benaroya and Baker to oversee negotiations. As set forth above, both Benaroya and Baker have long-standing close ties to Straus and are clearly not independent. [redacted]

37. [redacted] For example, Summit's initial offer valued InnovaCare's equity at $950 million. [redacted]

[redacted]

38. [redacted]

39. The Board also failed to condition the Merger on the approval of a majority of minority stockholders. Instead, the Merger was approved via written consent by stockholders owning approximately 74% of the outstanding stock. Those stockholders consisted of the Company's directors and officers, including Straus, Shinto, and Malton, and their affiliated entities.

**VI. The Side Deals Render the Merger Unfair**

40. The Company's directors and officers owed fiduciary duties to InnovaCare's minority stockholders such that they could not extract side benefits for themselves or allow others to do so at the expense of minority stockholders in connection with the Merger. Because Straus was the controlling stockholder of InnovaCare prior to the Merger, the Merger (including the side

deals) is subject to entire fairness review. Moreover, as the Merger was not approved by either a special committee of independent directors or by a majority of the Company's minority stockholders, the Board will have the burden to prove that the Merger and the side deals were entirely fair with respect to both process and price. They cannot meet this burden.

41. The process that led to the Merger was plainly unfair. As discussed above, the process was overseen by a Transaction Committee that was comprised of conflicted directors who are loyal to Straus. [redacted]

42. Additionally, the value of the various side benefits is unfair. Shinto and Malton's ability to roll over 25% of their equity stakes into the post-closing Company is unfair because they will benefit from InnovaCare's future growth while minority stockholders were forcibly cashed out of their investment.

43. Most egregiously, the Restricted Covenant Agreement provides Straus with a massive $64 million payment, or 6% of the total merger consideration, in exchange for Straus's purported agreement to non-competition obligations for a period of four years. [redacted]

[redacted]

44. [redacted] A quick review of the timeline for the Merger highlights the lack of realism. After a period of negotiation, Summit and InnovaCare executed a letter of exclusivity on February 29, 2019, final transaction documentation was completed and entered into on July 16, 2019 and the deal finally closed on December 26, 2019. The process took almost eleven months. [redacted]

45. [redacted]

[redacted]

46. [redacted] Directors and officers owe fiduciary duties to all stockholders and should not provide special side deals to controlling stockholders. [redacted]

47. Even if the $64 million payment were fair for a well-crafted non-compete agreement here (and Plaintiff asserts it is not), this particular agreement creates a host of exceptions and loopholes that Straus can exploit. The Restricted Covenant Agreement only prohibits Straus, for four years, from being an officer, director, member, stockholder, owner, co-owner, partner, trustee, employee, agent, representative, consultant, advisor, or manager of a business: (i) managing Medicare Advantage Plans or owning or managing primary care clinics in Puerto Rico; or (ii) managing Medicare Advantage Plans in Miami-Dade, Broward, and Palm Beach counties in Florida (each a "Competing Business").

48. Nonetheless, Straus is permitted to engage in any business or activity related to "Hospices, home care, pharmacies, palliative care, technology and related goods and services provided consistent with past practice."

49. Straus is also permitted to: (i) own a passive investment of less than 5% of the outstanding shares of any publicly traded company that engages in a Competing Business; (ii) own any interest in, no matter how large, or provide services to any mutual fund, private debt fund, private equity fund, credit fund, real estate fund, hedge fund, venture capital fund, or similar investment entity that invests in a Competing Business so long as he does not have an active day-to-day management role in the Competing Businesses; (iii) own a business or makes an investment in an entity that operated a competing business so long as (a) he does not have an active day-to-day management role in the Competing Business; and (b) for an acquisition or investment consummated within three years of the closing of the Merger, the revenues attributable to the Competing Business do not exceed 35% of the revenue of the entity at the time of the acquisition or investment; (iv) own an interest in real property that is leased to a Competing Business or provide services to a real estate investment fund or similar investment entity that leases real estate to a Competing Business; or (v) engage in speaking engagements receive honoraria in connection with such engagements.

50. This appears to permit the very type of transaction that Straus would be likely to undertake, even in the absence of the Restricted Covenant Agreement. Consider the following transaction: Straus organizes a fund, using his own capital or that of others, and acquires a Competing Business. So long as Straus does not become an officer or director of the Competing

Business nor have an "active day-to-day management role[5] in the Competing Business," this transaction would not be a violation of the Restricted Covenant Agreement.

51. Straus could also use one of his other companies of sufficient size to directly acquire a small Competing Business so long as the revenues of the Competing Business do not exceed 35% of the revenues of the combined business at the time of the acquisition. Then he can immediately expand the operations of that Competing Business without limit. Straus simply would not be able to take on an active day-to-day management role. Nothing would prevent him from providing regular advice to the Company's management.

52. Thus, not only is the amount paid to Straus grossly excessive, but the Restricted Covenant Agreement fails to limit his actions in any meaningful way.

53. [redacted] However, this ignores the loophole identified above that permits Straus to acquire, without violating the Restricted Covenant Agreement, any such competitor through any other business he owns through his family office that is sufficiently large enough. He would also be able to provide regular advice to the management of such business so long as he does not adopt a day-to-day management role.

## CLASS ACTION ALLEGATIONS

54. Plaintiff bring this action pursuant to Rule 23 of the Federal Rules of Civil Procedure individually and on behalf of all other similarly situated former holders of InnovaCare

[5] For the record, Straus did not have an "active day-to-day management role" at InnovaCare prior to the Merger.

common stock (except Defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with them and their successions in interest) who have been or will be threatened with injury arising from Defendants' wrongful actions, as more fully described herein (the "Class").

55. This Action is properly maintainable as a class action.

56. A class action is superior to other available methods of fair and efficient adjudication of this controversy.

57. The Class is so numerous that joinder of all members is impracticable. As of June 30, 2019, there were 102,037,257 shares of InnovaCare stock outstanding. Thus, upon information and belief, joinder of all Class members would be impracticable.

58. There are questions of law and fact common to the Class, including, inter alia, whether:

a. The Defendants breached their fiduciary duties; and

b. Plaintiff and the other members of the Class were injured by the wrongful conduct alleged herein and, if so, what is the proper measure of damages.

59. Plaintiff is committed to prosecuting this Action and has retained competent counsel experienced in litigation of this nature. Plaintiff's claims are typical of the claims of the other members of the Class, and Plaintiff has the same interests as the other members of the Class. Plaintiff is an adequate representative of the Class.

60. The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications with respect to individual members of the Class that would establish incompatible standards of conduct for Defendants or adjudications with respect to individual members of the Class that would, as a practical matter, be disjunctive of the

interests of the other members not party to the adjudications or substantially impair or impede their ability to protect their interests.

**COUNT I**

**Breach of Fiduciary Duty Against All Defendants as Directors**

61. Plaintiff hereby incorporates by reference and realleges each and every allegation contained above as though fully set forth herein.

62. As directors of InnovaCare, the Defendants owed Plaintiff and the Class fiduciary duties of good faith, loyalty, and care. As such, they were required to maximize the value received by minority stockholders in the Merger and they were required not to favor the interests of insiders.

63. In bad faith and in breach of their fiduciary duties, the Defendants approved the Merger and allowed Straus, Shinto, and Malton to receive lucrative side benefits and siphon off over one hundred million dollars in value from the Company's minority stockholders in connection therewith.

64. As a result of the Defendants' breaches of fiduciary duty, Plaintiff and the Class have been harmed.

**COUNT II**

**Breach of Fiduciary Duty Against Straus as Controlling Stockholder**

65. Plaintiff hereby incorporates by reference and realleges each and every allegation contained above as though fully set forth herein.

66. As the controlling stockholder of InnovaCare, Straus owed Plaintiff and the Class fiduciary duties of good faith, loyalty, and care. As such, Straus was required to maximize the value received by minority stockholders in the Merger and not favor his own interests.

67. In bad faith and in breach of his fiduciary duties, Straus favored his own interests in order to receive lucrative side benefits and siphon off approximately one hundred million dollars

in value from the Company's minority stockholders in connection with the Merger. As such he should be required to disgorge all unique benefits he received in connection with the Merger.

68. As a result of Straus's breaches of fiduciary duty, Plaintiff and the Class have been harmed.

## COUNT III

### Breach of Fiduciary Duty Against Straus and Shinto as Officers

69. Plaintiff hereby incorporates by reference and realleges each and every allegation contained above as though fully set forth herein.

70. As officers of InnovaCare, Straus and Shinto owed Plaintiff and the Class fiduciary duties of good faith, loyalty, and care. Moreover, as officers, they are not protected by any charter exculpatory provision. As such, they were required to maximize the value received by minority stockholders in the Merger and they were required not to favor the interests of insiders.

71. In breach of their fiduciary duties, Straus and Shinto extracted valuable side benefits for themselves and siphoned off over one hundred million dollars in value from the Company's minority stockholders in connection with the Merger. [redacted] As such, they should be required to disgorge all unique benefits they received in connection with the Merger.

72. As a result of Straus's and Shinto's breaches of fiduciary duty, Plaintiff and the Class have been harmed.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of itself and on behalf of the Class, prays for judgment as follows:

a. Declaring that this action is properly maintainable as a class action and appointing Plaintiff as class representative;

b. Finding the Defendants liable for breaching their fiduciary duties;

c. Ordering disgorgement of all unique benefits received by Defendants in connection with the Merger;

d. Awarding Plaintiff and the other members of the Class damages in an amount that may be proven at trial, together with interest thereon;

e. Awarding the Plaintiff the costs and disbursements of this action, including attorneys', accountants, and experts' fees; and

f. Awarding such other and further relief as this Court may deem just, equitable, and proper.

*/s/ James E. Cecchi*

James E. Cecchi
Mark M. Makahil
CARELLA, BYRNE, CECCHI
OLSTEIN, BRODY & AGNELLO
5 Becker Farm Road
Roseland, New Jersey 07068
(973) 994-1700

Ned Weinberger
LABATON SUCHAROW LLP
300 Delaware Avenue
Suite 1340
Wilmington, DE 19801
(302) 573-2540

David Schwartz
John Vielandi
David MacIsaac
LABATON SUCHAROW LLP
140 Broadway
New York, NY 10005
(212) 907-0700

*Attorneys for Plaintiff*